UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DORENE JORDAN,

              Plaintiff,                        Case No. 21-10643

vs.                                          HON. MARK A. GOLDSMITH

TIM MENJOULET,

              Defendant.
_____/

**OPINION & ORDER
(1) DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. 51),
(2) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO
EXCLUDE EXPERT TESTIMONY (Dkt. 49), (3) GRANTING IN PART AND DENYING
IN PART PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY (Dkt. 50),
(4) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO
PRECLUDE ADMISSION OF VARIOUS CATEGORIES OF EVIDENCE (Dkt. 63),
(5) GRANTING PLAINTIFF'S MOTION TO EXCLUDE CHARACTER EVIDENCE
(Dkt. 64), AND (6) DENYING WITHOUT PREJUDICE PLAINTIFF'S MOTION TO
EXCLUDE EXHIBITS (Dkt. 65)**

Following their skiing collision, Plaintiff Dorene Jordan brings this diversity action against

Defendant Tim Menjoulet under the Michigan Ski Area Safety Act, Mich. Comp. L. § 408.321

(SASA).  Before the Court are Menjoulet's motion for summary judgment (Dkt. 51), Menjoulet's

motion to exclude Jordan's expert (Dkt. 49), Jordan's motion to exclude Menjoulet's expert (Dkt.

50), and additional motions raising various evidentiary issues.  For the reasons that follow, the

Court (i) denies Menjoulet's motion for summary judgment, (ii) grants in part and denies in part

the parties' motions to exclude each other's experts, (iii) grants in part and denies in part

Menjoulet's motion in limine to preclude the admission of various categories of evidence (Dkt.

63), (iv) grants Jordan's motion to exclude character evidence (Dkt. 64), and (v) denies without

prejudice Jordan's motion to exclude exhibits as hearsay (Dkt. 65).[1]

## I. BACKGROUND

Jordan and Menjoulet were both present at Caberfae Peaks Ski Area in Cadillac, Michigan on November 24, 2019.  See Def. Br. in Supp. Mot. Summ. J. at 4; Pl. Br. in Supp. Resp. to Mot. Summ. J. at 1.  Jordan was skiing, while Menjoulet was snowboarding.  Def. Br. in Supp. Mot. Summ. J. at 4.[2]

Menjoulet testified that, at the time of the incident, he was on his second run of the day. See Menjoulet Dep. at 44–45 (Dkt. 58-4).  He saw Jordan, downhill from himself, merge onto his trail.  Id. at 19.  She appeared from behind a group of trees to Menjoulet's left.  Id. at 45.  Menjoulet did not see Jordan look uphill in his direction.  Id. at 19, 45.

Menjoulet recalled that Jordan "traverse[d]" all the way across" the trail—i.e., perpendicular to Menjoulet's route—and at a certain point, Jordan "turn[ed] downhill."  Id. at 19. Menjoulet testified that he "start[ed] to turn to the right to avoid her," but by the time Jordan was turning downhill, Menjoulet thought that he was "either going to hit the trees or hit [Jordan] on [her] right side."  Id.  They collided.  Id.  When asked if he had consciously chosen to hit Jordan rather than the trees, Menjoulet said, "I guess."  Id.  Menjoulet remembered that "two–three

---

[1] Because oral argument will not aid the Court's decisional process, the motion will be decided based on the parties' briefing.  See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b).  In addition to the motions, the briefing includes Jordan's response to Menjoulet's motion for summary judgment (Dkt. 58), Menjoulet's reply (Dkt. 62), Jordan's response to Menjoulet's motion to exclude Jordan's expert (Dkt. 55), Menjoulet's response to Jordan's motion to exclude Menjoulet's expert (Dkt. 52), and Jordan's reply (Dkt. 61), Jordan's response to Menjoulet's motion to preclude admission of various categories of evidence (Dkt. 72), Menjoulet's reply (Dkt. 74), Menjoulet's response to Jordan's motion to exclude character evidence (Dkt. 71), Menjoulet's response to Jordan's motion to exclude exhibits (Dkt. 73), and Menjoulet's response to Jordan's motion for bene esse depositions or remote appearances (Dkt. 70).  The Court also takes under advisement Jordan's motion to take de bene esse depositions or to have witnesses appear remotely (Dkt. 68).

[2] Because the SASA defines "skier" to include a snowboarder, see Mich. Comp. L. §408.322(g), the Court's references to "skiing" include "snowboarding" throughout this opinion.

seconds at the most" passed between when he saw Jordan emerge and the moment of impact.  Id. at 37.

Jordan's version of events is that, because she was on her "first run" of the day, she was "taking it slow."  Jordan Dep. at 20 (Dkt. 58-2).  She was skiing with her husband, who was six or seven feet in front of her.  Id. at 21.  Jordan stated that she saw "some other runs to [her] left behind a grove of trees," and as she "was passing . . . that other run," she "looked" and "saw no one."  Id. at 21.  That is, she "[d]idn't see anyone to the left" of her.  Id.; see also id. at 22 (confirming that she looked to her left).  Jordan did not see Menjoulet approaching; at the moment of impact, she "felt a hard, hard hit."  Id. at 21.

No other witnesses saw the collision, though fellow skier Joshua Higgs testified that he saw Jordan merge onto a trail, "heard" the collision, and turned around to see the "aftermath."  Higgs Dep. at 18–20 (Dkt. 52-6).  Higgs also testified that he observed the manner in which Jordan and Menjoulet were skiing prior to the accident.  Id. at 15–17.

There appears to be confusion as to the location of the collision.  The following trail map is taken from the Caberfae website, and it is consistent with trail maps presented by both Jordan's expert, Jasper Shealy, see 3/1/22 Shealy Rep. at 4 (Dkt. 49-2), and Menjoulet's expert, Mark Petrozzi, see Petrozzi Rep. at 7 (Dkt. 50-2).  Four trails are potentially relevant, running parallel from left to right from a downhill skier's perspective: Gum Drop, Candy Cane, Easy Street, and Taffy:[3]

---

[3] See Caberfae "TRAIL MAP," available at https://caberfaepeaks.com/themountain/trail-map/ (last accessed March 30, 2023).



Menjoulet understood in hindsight that Jordan merged onto his trail from Candy Cane, which—if he is correct that she came from his left—would put Menjoulet and the collision on Easy Street.  See Menjoulet Dep. at 19–20 ("[O]n the other side . . . is the run, I think it's called Candy Cane according to their map, so [Jordan] was on that.  I was on the main run there adjacent to those trees.").  Conversely, Menjoulet asserts in the present briefing that he was on Candy Cane, and Jordan merged onto Candy Cane—indicating that Jordan had departed Gum Drop.  See Def. Mot. Summ. J. at 6.  Higgs provided a written statement stating that Jordan merged from Easy Street onto Candy Cane.  See Pl. Br. in Supp. Resp. to Mot. Summ. J. at 7 (citing Higgs Stat. (Dkt. 58-5)).  Other individuals who investigated the incident agree that Jordan merged onto Candy Cane, though they do not agree on the precise location of the collision.[4]

---

[4] Petrozzi concludes that Jordan merged from Gum Drop onto Candy Cane, and he places the collision at the intersection of these two trails.  See Petrozzi Rep. at 3, 7.  Caberfae ski patroller Alan Devereaux, who arrived after the collision, thought it occurred ten to twenty yards below the intersection of Gum Drop and Candy Cane.  See Devereaux Dep. at 37 (Dkt. 49-5)).  Shealy agrees that Jordan merged onto Candy Cane, see 3/1/22 Shealy Rep. at 1, but the map in his latest report places the proposed collision point at the intersection of Easy Street and Taffy, see id. at 4.  Jordan also cites the testimony of Caberfae's operations manager, Timothy Meyer, who investigated after

## II.  ANALYSIS

Jordan asserts a claim against Menjoulet under the SASA.  See 3d Am. Compl. ¶¶ 18–22

(Dkt. 27); 11/18/21 Op. & Order (Dkt. 38).  Menjoulet moves for summary judgment, each party

moves to exclude the testimony of the other's expert, and the parties raise additional evidentiary

issues.  The Court addresses each motion in turn.

### A. Motion for Summary Judgment[5]

"[T]he SASA place[s] an affirmative duty on all skiers to ski within their abilities, to

maintain reasonable control of their speed and course at all times, and not to ski in a manner that

could contribute to the injury of another skier."  Rusnak v. Walker, 729 N.W.2d 542, 545 (Mich.

Ct. App. 2006) (citing Mich. Comp. L. §§ 408.341(1) and 408.342(1)(a)).[6]

The SASA also provides that "collisions with other skiers are an obvious and necessary

danger that inheres in the sport and that the skier has assumed the risk of being injured by such a

danger."  Rusnak, 729 N.W.2d at 546 (citing Mich. Comp. L. § 408.342(2)).  Thus, "a plaintiff

---

the collision and who understood that Jordan merged onto Candy Cane, where he thought the collision occurred.  Pl. Br. in Supp. Resp. to Mot. Summ. J. at 9–10 (citing Meyer Dep. at 40–41 (Dkt. 51-10)).

[5] In assessing whether Menjoulet is entitled to summary judgment, the Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007).  The movant is entitled to summary judgment if that party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can survive summary judgment only by coming forward with evidence showing there is a genuine issue for trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1986).

[6] See Mich. Comp. L. § 408.341(1) ("A skier shall conduct himself or herself within the limits of his or her individual ability and shall not act or ski in a manner that may contribute to his or her injury or to the injury of any other person.  A skier shall be the sole judge of his or her ability to negotiate a track, trail, or slope."); Mich. Comp. L. § 408.342(1)(a) ("While in a ski area, each skier shall . . . [m]aintain reasonable control of his or her speed and course at all times.").

assumes the risk of colliding with another skier." Id. at 548.  However, "a plaintiff can still recover limited damages against an individual skier if the plaintiff can prove that a defendant violated the duties placed on skiers and that the defendant's violation of the SASA caused the injuries suffered by the plaintiff." Id. (citing Mich. Comp. L. § 408.344).[7]

Menjoulet submits that there is no disputed material fact as to his positions that he conducted himself within the limits of his individual ability, he maintained reasonable control of his speed, and he maintained reasonable control of his course.  Def. Mot. Summ. J. at 7–10.

On the contrary, all of the factors relevant to whether Menjoulet violated his duties under the SASA are rife with issues of fact.  Front and center is the lack of clarity as to the skiers' relative positions when Jordan merged onto Menjoulet's trail and the precise location of the eventual collision.  Jordan's expert relies on assumptions about these locations to estimate Menjoulet's speed and the time that passed between Jordan's entry onto the trail and the collision, see 3/1/22 Shealy Rep. at 2–3, and to challenge Menjoulet's testimony that he had two to three seconds to avoid Jordan, Menjoulet Dep. at 37; 3/1/22 Shealy Rep. at 3 (determining that Menjoulet had over seven seconds).  Thus, material facts remain in dispute regarding whether Menjoulet was in control of his speed.  See Rusnak, 729 N.W.2d at 545.

Additionally, Jordan points to Higgs's testimony that, prior to the collision, Higgs observed Menjoulet skiing in a "shaky" manner and having difficulty making turns, see Higgs. Dep. at 15–17, which calls into dispute whether Menjoulet was skiing within the limits of his individual ability.  Jordan and Menjoulet also have different memories of whether Jordan looked uphill to

---

[7] See Mich. Comp. L. § 408.342(2) ("Each person who participates in the sport of skiing accepts the dangers that inhere in that sport insofar as the dangers are obvious and necessary.  Those dangers include . . . collisions . . . with other skiers . . . ."); id. § 408.344 ("A skier . . . who violates this act . . . shall be liable for that portion of the loss or damage resulting from that violation.").

check for other skiers before merging, see Menjoulet Dep. at 19, 45; Jordan Dep. at 21–22, which is relevant for understanding the speed and manner in which she merged onto a trail where another skier was already present. These points raise material issues of fact as to whether Menjoulet was in control of his course, whether he was skiing outside his individual ability, and whether he was skiing in a manner that could contribute to the injury of others. See Rusnak, 729 N.W.2d at 545.

Menjoulet challenges the credibility of Higgs's statements, but the resolution of "issues of credibility and . . . basic issues of fact" is "the essence of the jury's role." Heins v. Dust, No. 205-cv-00291, 2007 WL 1701793, at *6 (W.D. Mich. June 8, 2007) (denying defendant's motion for summary judgment in SASA case arising from skiing collision). And Menjoulet's assertion that he was "'snowboarding under control'" when he attempted to avoid Jordon, Def. Mot. Summ. J. at 9–10 (quoting Menjoulet Dep. at 29), is simply one piece of evidence among others pointing to different conclusions.

Menjoulet also cites to the deposition testimony of Jordan's proffered expert, who—assuming that Menjoulet was snowboarding between 15 and 20 miles per hour—stated that this speed was "'reasonable'" "'under those circumstances.'" Def. Mot. Summ. J. at 9 (quoting Shealy Dep. at 33 (Dkt. 51-3)). But this statement was conditional on Menjoulet's speed, which remains unresolved. Shealy also clarified that he thought Menjoulet's speed could have been reasonable "until the ultimate moment" of collision, not that he believed Menjoulet maintained a reasonable speed throughout his run. Shealy Dep. at 59; see also id. at 14–15 (stating that Shealy "believe[d]" that Menjoulet was in control "up until the point of the collision"). The reasonableness of Menjoulet's speed thus remains subject to disputed material facts, and "when there are material factual disputes, the question of reasonableness is left to the jury." Gardner v. Evans, 920 F.3d 1038, 1050 (6th Cir. 2019).

Menjoulet has not identified any SASA cases where a collision between skiers produced a record without genuine issues of material fact.  Rather, case law indicates that summary judgment is often inappropriate to resolve a skier's alleged violation of duties under the SASA.  See Heins, 2007 WL 1701793, at *6; Rusnak, 729 N.W.2d at 551 (reversing grant of summary disposition).  In this case, the question of whether Menjoulet injured Jordan by skiing beyond his ability, failing to maintain control of his speed or course, or otherwise skiing in a dangerous manner cannot be resolved without a trier of fact.  See Rusnak, 729 N.W.2d at 545.  The Court denies Menjoulet's motion for summary judgment.

**B. Motions to Exclude Expert Witnesses**

Federal Rule of Evidence 702 allows a "witness who is qualified as an expert by knowledge, skill, training, or education" to "testify in the form of an opinion" if (i) "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (ii) "the testimony is based on sufficient facts or data," (iii) "the testimony is the product of reliable principles and methods," and (iv) "the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702(a)–(d).  Thus, courts must ensure that purported expert testimony is both relevant and reliable.  See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589–590 (1993).  When determining if testimony is "reliable," a court "is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation."  In re Scrap Metal Antitrust Litig., 527 F.3d 517, 529–530 (6th Cir. 2008).  "[M]ere weaknesses in the factual basis of an expert witness opinion bear on the weight of the evidence rather than on its admissibility."  Id. at 530 (punctuation modified).

Each proposed expert must submit a report that includes, among other information, "a complete statement of all opinions the witness will express and the basis and reasons for them"

8

and "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i)–(ii); see also R.C. Olmstead, Inc., v. CU Interface, LLC, 606 F.3d 262, 271 (6th Cir. 2010) (explaining that expert "reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions") (punctuation modified). A party may also disclose expert testimony "intended solely to contradict or rebut evidence on the same subject matter identified by another party" per an expert report. Fed. R. Civ. P. 26(a)(2)(D)(ii).

Each party challenges an expert report presented by the other, and the Court proceeds by considering objections to each report. But before turning to the individual reports, the Court considers an issue relevant to the testimony of both experts: whether the experts can testify on the National Ski Area Association (NSAA) "Skier Responsibility Code," also referred to as "Your Responsibility Code."

### i.     Admissibility of Testimony on Skier Responsibility Code

Both experts refer to the Skier Responsibility Code in their reports. See 7/29/21 Shealy Rep. at 1; Petrozzi Rep. at 11–12. Menjoulet, however, argues that the code is "irrelevant" to the question of whether a skier has violated his or her duties under the SASA and is "inconsistent" with the SASA, and so he submits that the Code is not a proper topic of expert testimony and that its probative value is substantially outweighed by a danger of prejudice to Menjoulet or of confusing the issues under Federal Rule of Evidence 403. See Def. Mot. to Exclude at 4–5, 10; see also Def. Mot. to Preclude at 12. Conversely, Jordan asserts that the code is relevant to considering skiers' duties under the SASA. See Pl. Br. in Supp. Resp. Mot. Summ. J. at 16; Pl. Br. in Supp. Resp. to Mot. to Exclude at 4–5.

The Skier Responsibility Code is an NSAA-endorsed list of expectations for skiers. See, e.g., Petrozzi Rep. at 11. Its provisions include: "Always stay in control"; "People ahead of you have the right of way"; and "Whenever starting downhill or merging, look uphill and yield." Id.

As Menjoulet correctly notes, the Michigan Court of Appeals has stated: "the SASA does not provide for the adoption of safety standards by outside agencies . . . ." McCormick v. Go Forward Operating Ltd. P'ship, 599 N.W.2d 513, 516 (Mich. Ct. App. 1999).[8] McCormick made this statement to distinguish the SASA from the Roller Skating Safety Act, which explicitly requires compliance with safety standards published by a rink operators association. Id.; see also McGoldrick v. Holiday Amusements, Inc., 618 N.W.2d 98, 100 (Mich. Ct. App. 2000) (affirming grant of summary disposition to defendant ski resort alleged to be liable under the SASA where plaintiff "d[id] not cite any specific violations of the SASA" but rather "only discusse[d] violations of safety regulations set forth in the [ANSI]").

Jordan submits that the Michigan Court of Appeals clarified the applicability of external standards to the SASA in Kent v. Alpine Valley Ski Area, 613 N.W.2d 383 (Mich. Ct. App. 2000). Kent affirmed a grant of summary disposition to a defendant ski resort because plaintiff's claims based on a chairlift accident fell within the SASA's immunity provisions. Kent, 613 N.W.2d at

---

[8] In McCormick, a skier brought a SASA claim against a ski resort's owner after suffering an injury near the departure point of a ski lift, alleging in part that the facility had violated standards under the American National Standard for Passenger Tramways (ANSI) requiring that a lift be stopped when a situation arises that might be dangerous to passengers. 599 N.W.2d at 514–516. In affirming summary disposition in favor of the defendant, the court found that a violation of external standards was no exception to the immunity then understood to attach under the SASA's assumption-of-risk provision. Id. at 515–516 (explaining that a defendant is "immune from liability" under the SASA for injuries arising from skiing collisions because collisions are a "necessary and obvious danger of skiing"). Rusnak has since clarified that defendants can be liable for violating their duties under the SASA, notwithstanding the assumption-of-risk provision. Rusnak, 729 N.W.2d at 546–551.

389–391.  <u>Kent</u>'s decision was not impacted by the consideration of external standards, but <u>Kent</u>

discussed <u>McCormick</u> and stated in a footnote:

> While we agree that the SASA does not provide for the adoption of standards by outside agencies, neither does it <u>prohibit</u> the adoption of such standards.  Indeed, the <u>McCormick</u> Court notes that the ANSI standards for passenger tramways were adopted by reference by the Ski Area Safety Board.  Further, we would find that the SASA arguably <u>does</u> provide for an exception to immunity for violation of those standards as follows: "A skier or passenger who violates this act, or an operator who violates this act shall be liable for that portion of the loss or damage resulting from that violation."

<u>Id.</u> at 390 n.5 (emphasis in original) (quoting Mich. Comp. L. § 408.344).  Consistent with <u>Kent</u>'s

discussion of Mich. Comp. L. § 408.344, the Michigan Court of Appeals subsequently found that

this provision <u>does</u> allow for liability—i.e., an exception to immunity—where a defendant violates

his or her duties under the SASA.  <u>Rusnak</u>, 729 N.W.2d at 548.  <u>Kent</u> suggests that whether a

defendant has violated external standards may inform whether a defendant has violated his or her

duties under the SASA.  <u>Kent</u>, 613 N.W.2d at 390 n.5.

Given <u>Kent</u>'s pronouncement that the SASA does not prohibit consideration of external

standards, as well as the factual distinction that the above-cited cases involved different external

standards applied to suits against ski facilities rather than fellow skiers, the Court finds that

Michigan case law allows for consideration of external skiing standards in certain circumstances.

This is one of those circumstances.  Menjoulet's own expert insists not only that the Skier

Responsibility Code is widely publicized at ski resorts across the country such that anyone "with

even minimal [skiing] experience . . . ought to be familiar" with it, but also that Caberfae

specifically promoted the code and included a copy of the code on its website.  Petrozzi Rep. at

11.[9]  Because skiers at the specific location where the collision occurred were encouraged to

---

[9] <u>See</u> Caberfae, "SAFETY INFORMATION," available at https://caberfaepeaks.com/safety/ (last accessed March 30, 2023).

consider these safety standards, the Court finds that testimony on the code is relevant to the question of whether Menjoulet "ski[ed] in a manner that could contribute to the injury of another skier" or otherwise violated his duties under the SASA. Rusnak, 729 N.W.2d at 545. The probative value of testimony on the code is not "substantially outweighed" by the danger of unfairly prejudicing Menjoulet or confusing the issues. Fed. R. Evid. 403. The Court will allow testimony on this topic. This approach appears to be consistent with that adopted in other jurisdictions. See Lipton v. Mountain Creek Resort, Inc., No. CV134866KMMAH, 2019 WL 4597205, at *7 (D.N.J. Sept. 23, 2019) (allowing expert in skiing collision case to offer "opinions on industry standards of care and safety standards").

The Court next addresses the other challenges brought against the parties' expert reports.

**ii.      Jordan's Motion to Exclude Menjoulet's Expert's Testimony**

Jordan moves to exclude the testimony of Petrozzi, who asserts expertise in "ski area operations, risk management and respective ski area and skier responsibilities and conduct." Petrozzi Rep. at 1. He claims to be a risk management consultant who has worked with over 130 different ski resorts, a certified ski patroller, and chair of the NSAA Risk Management Committee. Id. at 1–3. Jordan launches multiple challenges at Petrozzi's opinions, including that he "acts as a mere conduit for the defense position" and "adds nothing of any expertise to the equation." Pl. Mot. to Exclude at 2. The Court addresses the admissibility of each of Petrozzi's purported opinions.

**a.   Insufficient Time and Distance**

Petrozzi's first opinion explains that Jordan merged onto Menjoulet's trail and crossed in front of Menjoulet's path, and then states:

> Mr. Menjoulet had 2-3 seconds to attempt to avoid her[;] however, [he] was
> provided insufficient time and distance to do so and the collision occurred, with

Mr. Menjoulet impacting Ms. Jordan from behind, whereupon she fell and sustained her injuries.

Petrozzi Rep. at 13; see also id. at 12 (asserting that two to three seconds was "insufficient time and (remaining) distance" for Menjoulet to avoid Jordan "without collision"); id. at 6 (referring to Menjoulet's testimony that he "'tried to avoid [Jordan] and in that timeframe of a few seconds, [but] there was not enough time . . . .'") (quoting Menjoulet Dep. at 22–23).

Petrozzi provides no explanation for why two to three seconds was an insufficient amount of time for Menjoulet to avoid a collision with Jordan. He does not assert any assumptions about the specific speeds at which the skiers were traveling or the distances they covered.[10] He does not refer to any "reliable principles and methods" which he used to conclude that Menjoulet could not have physically avoided a collision with Jordan in that time. Fed. R. Evid. 702(c). Because Menjoulet provides no explanation for this opinion, the Court will exclude this testimony. See Fields v. Ashford, No. 17-cv-11812, 2019 WL 5704216, at *1 (E.D. Mich. Nov. 5, 2019) (excluding expert's testimony on car accident where expert "did not conduct any analysis that would allow him to say that [party] didn't have enough time to avoid the accident" and "did not employ any analytical methodology, much less a reliable one") (punctuation modified); Gorajczyk v. City of St. Clair Shores, No. 08-14764, 2010 WL 3245432, at *3–*4 (E.D. Mich. Aug. 17, 2010) (granting motion to strike expert testimony where expert "failed to proffer any reasoning for his conclusion" and did "not explain the rationale which led him to his conclusion").

---

[10] In the present briefing, Menjoulet attempts to add flesh to Petrozzi's skeletal conclusion by insisting that Petrozzi "relied upon the testimony of Alan Devereaux to determine the approximate collision location" and calculated "a conservative, estimated speed of travel of 15 MPH for plaintiff together with [a distance travelled of] 10 yards (or 30 feet) to the collision location." Def. Resp. to Pl. Mot. to Exclude at 9 (citing Petrozzi Dep. at 18–19, 20–23 (Dkt. 52-9)). However, there is no indication in Petrozzi's report that this opinion relied on any estimates of the skiers' speeds or distances travelled.

13

b. **Control**

Petrozzi's second opinion states:

[T]here is no evidence that right up until the time of the collision, that [Menjoulet] was snowboarding out of control, which is supported by his testimony that he had 'started to turn to the right', evidencing that he was under control and able to turn until Ms. Jordan 'turned at the last minute' so that he was unable to avoid her.

Petrozzi Rep. at 13 (quoting Menjoulet Dep. at 23). Petrozzi further states: "In other words, once [Menjoulet] started to turn, when Ms. Jordan turned, he is now without time or space to avoid both Ms. Jordan and the trees and collides with Ms. Jordan." Id. at 9. Thus, Petrozzi appears to offer an opinion that Menjoulet maintained control of his course based on Menjoulet's testimony that he was "able to turn" immediately prior to the collision.

Again, Petrozzi fails to explain how Menjoulet's ability to turn indicates that Menjoulet was in control of his course, never mind an explanation that is "the product of reliable principles and methods." Fed. R. Evid. 702(c). Petrozzi cannot turn his conclusion that Menjoulet was in control of his course into an expert opinion by merely noting that Menjoulet had some ability to change the direction of his route in the immediate lead-up to the collision. Menjoulet does not refer to any assumptions about a snowboarder's ability to alter his or her route when travelling at certain speeds, nor any scientific studies addressing a snowboarder's ability to turn while in motion. Because Petrozzi "does not explain the rationale which led him to his conclusion," the Court will exclude this testimony. Gorajczyk, 2010 WL 3245432, at *3.[11]

---

[11] Petrozzi also assesses and finds untrustworthy Higgs's contrary testimony that Menjoulet appeared to snowboard out of control prior to his collision with Jordan. See Petrozzi Rep. at 8–9. Additionally, Menjoulet attempts to defend Petrozzi's opinion about Menjoulet's "control" by pointing to statements made during Shealy's deposition. See Def. Resp. to Pl. Mot. to Exclude at 4 (citing Shealy Dep. at 59) (reflecting Shealy's response of "I believe so" to the question of whether Menjoulet "was in control up until the point of the collision"). However, neither (i) Petrozzi's discussion of evidence indicating that Menjoulet was not in control nor (ii) the testimony of another expert buttresses the bare explanation in Petrozzi's report for the opinion at issue here.

### c.  Inherent Risk

Petrozzi states: "The ski/snowboard accident involving Ms. Jordan and Mr. Menjoulet, along with Ms. Jordan's ensuing injuries were inherent risks of the sport of skiing. . . .  [A]s it is essentially impossible or unreasonably difficult to eliminate the risk of collisions amongst skiers . . . , the obvious and necessary risk of collisions is and must be accepted by each person who participates in the sport of skiing (in general) and Ms. Jordan (in particular) . . . ."  Petrozzi Rep. at 13; see also id. at 10.

Petrozzi's assertion that Jordan assumed the risk of a collision is irrelevant to the question of Menjoulet's liability under the SASA.  It is undisputed under the statute "that collisions with other skiers are an obvious and necessary danger that inheres in the sport and that the skier has assumed the risk of being injured by such a danger."  Rusnak, 729 N.W.2d at 546 (citing § 408.342(2)).  Nonetheless, "in those cases in which a plaintiff can establish that a defendant violated one of the specific duties imposed by the SASA, the plaintiff can still recover damages to the extent that the defendant's violations caused the plaintiff's injuries."  Id.  The relevant question is whether Menjoulet caused Jordan's injuries by violating duties established under the SASA.  See id.  Petrozzi's opinion on an uncontroverted point of no relevance to Menjoulet's liability will not "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  The Court will exclude this testimony.

### d.  Jordan's Duty to Look Uphill

Petrozzi submits that Jordan "should" have been "looking uphill (to her left)" before merging; however, Jordan merged onto Menjoulet's trail "apparently all without looking."

---

Further, as to Petrozzi's opinion of Higgs's credibility, "[e]xperts may not testify about the credibility of other witnesses."  Smith v. Jones, 721 F. App'x 419, 423 (6th Cir. 2018).

Petrozzi Rep. at 8; see also id. at 11–12 ("Jordan . . . should have looked uphill to observe whether the way was clear for her to do so . . . ."). These statements rely on the Skier Responsibility Code.

Petrozzi has established sufficient expertise to offer the jury insight on expectations for skier safety. Petrozzi may offer "opinions on industry standards"—i.e., on the Skier Responsibility Code. Lipton, 2019 WL 4597205, at *7.

### iii. Menjoulet's Motion to Exclude Jordan's Expert's Testimony

Menjoulet moves to exclude the testimony of Shealy. Shealy testified that he has a Ph.D in industrial engineering and that he specializes in "human factors," which he explains is "an engineering discipline that studies human performance, both from a psychological as well as a physiological perspective in order to better understand how humans function." Shealy Dep. at 2 (Dkt. 49-3). Shealy submitted an initial July 29, 2021 report (Dkt. 49-1) and a March 1, 2022 rebuttal report (Dkt. 49-2). The Court addresses each of Shealy's proposed opinions.[12]

---

[12] Menjoulet characterizes Shealey's second report as "late-disclosed," but he does not make a specific argument that the Court should exclude the report as untimely. Def. Mot. to Exclude at 5. Jordan argues that the untimeliness argument would result in the exclusion of Menjoulet's own expert report, but she submits that "there is no harm" to considering all expert reports given that the parties have been cooperating on this issue, and that the Court extended the expert discovery deadline (though not the deadline for expert reports). Pl. Resp. to Def. Mot. to Exclude at 9 n.3. The deadline for expert reports was December 3, 2021 for Jordan and December 24 for Menjoulet. See 5/28/21 Order at 1 (Dkt. 22). Shealy's first report met this deadline, but not Petrozzi's report, dated February 10, 2022, or Shealy's second report.

Jordan also points out—correctly—that Shealey's March 1, 2022 report is timely "to the extent" that it rebuts Petrozzi's February 10, 2022 report. See Pl. Resp. to Def. Mot. to Exclude at 9 n.3 (citing Fed. R. Civ. P. 26(a)(2)(D)(ii) (allowing disclosure of expert testimony "intended solely to contradict or rebut evidence on the same subject matter" of the opposing party's expert report)). Shealey identifies his report as a "rebuttal" to Petrozzi's report. See 3/1/22 Shealey Rep. at 1.

Menjoulet elected not to file a reply to engage with this argument. The Court will not reject any expert report as untimely. Additionally, without any input from Menjoulet on whether Shealy's second report is properly within the scope of a rebuttal report, the Court finds that Shealy's testimony in his second report is closely related enough to Petrozzi's asserted testimony to survive as a rebuttal report where its content is otherwise admissible.

### a.  Skier Responsibility Code

Shealy opines that "Menjoulet was in violation of the first two elements of the Responsibility Code"—i.e., "Always stay in control," and "People ahead of you have the right of way"—"when he overtook and collided with the Plaintiff Jordan."  7/29/21 Shealy Rep. at 2.

Like Petrozzi, Shealy may offer opinions on the standards reflected in the Skier Responsibility Code.  See Lipton, 2019 WL 4597205, at *7.

### b.  Likely Speeds and Distances

In rebuttal, Shealy presents a series of opinions related to the likely speeds and distances of the individuals involved in the collision.  He submits: "A reasonable accident reconstruction shows that more likely than not, [Jordan] was going about 10 mph (15 f/s), the distance she traversed across Candy Cane was on the order of 112 feet, which means it would take her about 7.5 seconds to cross the trail."  3/1/22 Shealy Rep. at 2–3.  He also opines: "Rather than a rushed 2–3 seconds in which to react, [Menjoulet] had at least 7.5 seconds if not longer to react and decide what to do . . . ."  Id. at 3.  Because "[h]uman reaction time to unexpected events is on the order of 1.5 to 2.0 seconds," Menjoulet "had more than enough time to correctly assess the situation and take a different and better path . . . ."  Id.  Relatedly, Shealy states that Menjoulet was between 165 and 196 feet uphill from Jordan when she entered the trail.  Id.

These estimates are based on Shealy's "use of Google Earth and GIS software" to construct an accident reconstruction analysis.  Id. at 1.  He depicts the locations he considers relevant to this analysis on a map of the Caberfae trails.  Id. at 4.  Point A is the location where "[Jordan] first emerged from the side of Candy Cane."  Id. at 2.  Point B is "the approximate point of the collision . . .," which is 112 feet from Point A.  Id.

Shealy submits that a "reasonable assumption" of Jordan's speed is 10 m.p.h. given she

was 66 years old and "seeking to get back into skiing form." Id.  When asked about his assumption

that Jordan was traveling at 10 m.p.h., Shealy admitted that she could have been traveling faster,

but he did not "think [she] could have been going a lot faster, and if [she] were going any slower .

. . on such a gentle slope, [she] might have trouble just making forward progress."  Shealy Dep. at

47.

Noting that the average maximum speed of snowboarders on well-groomed slopes is 24

m.p.h. according to his own study, Shealy submits that it is "conservative but reasonable" to

assume that Menjoulet was traveling at between (i) 15 m.p.h., which would place Menjoulet at

about Point C when Jordan entered the trail (140 feet uphill), assuming that both he and Jordan

took 7.5 seconds to reach the collision point; and (ii) 20 m.p.h., which would place Menjoulet at

about Point D (196 feet uphill), based on the same assumption.  3/1/22 Shealy Rep. at 2.

As Menjoulet observes, see Def. Mot. to Exclude at 5–6, Shealy admitted during his

deposition that his demarcation of Point A is "inaccurate in that it's uphill from where it ought to

be" and should be a "little bit more to the right," Shealy Dep. at 36.  Menjoulet also notes that

Shealy's graphical depiction of Points A and B measures "the width of Lower Easy Street trail"

rather than "the width of Candy Cane trail," Def. Mot. to Exclude at 6, and Menjoulet further

suggests that Shealy identified an incorrect collision point, as the collision actually occurred below

the intersection of Candy Cane and Gum Drop, id. at 8.  Additionally, Menjoulet notes that Shealey

testified that he assumed a traverse angle of 30 degrees, but he did not consider the terrain or

topography when making this assumption.  Id. at 6 (citing Shealy Dep. at 38).  Menjoulet concludes

that Shealy's opinions are speculative and unsupported by the facts.

The Court will not exclude Shealy's opinions on the skiers' likely speeds and distances,

nor his opinion on human reaction time.  Menjoulet's challenges to Shealy's assumptions "bear on

the weight of the evidence rather than on its admissibility" and are best suited for cross-examination.  In re Scrap Metal, 527 F.3d at 530 (punctuation modified).  Many of the relevant facts pertaining to the likely speeds of the skiers and distances travelled are disputed or unknowable, but as an author of snowboarding speed research, Shealy can provide a framework to help the jury consider possible variables at play and the likely ranges of the relevant figures. Minor potential "inaccuracies" in his underlying assumptions do not defeat the entire analysis where the relevant facts are unresolved, and Menjoulet will be free to undermine Shealy's conclusions by attacking his assumptions.

### c.  Expectations on "Green" Trail

In rebuttal, Shealy opines that the incident took place on a green circle trail—the easiest difficulty level—and so "would likely contain relatively inexperienced skiers and snowboarders," such that "one would expect a person with some 30 years snowboarding experience, such as [Menjoulet], would practice more caution than usual . . . ."  3/1/22 Shealy Rep. at 3.  Shealy is qualified to discuss the meaning of a green circle trail.  The Court will allow him to testify on this topic.

### d.  Conscious Decision to Collide

In rebuttal, Shealy states that Menjoulet "ultimately made a conscious choice to run into [Jordan] rather than go into the trees, thus it was his bad decision that resulted in the collision." 3/1/22 Shealy Rep. at 3.  Shealy's assertions here are based entirely on Menjoulet's own testimony. His opinion adds no specialized knowledge that would help a jury understand the evidence.  See Fed. R. Civ. P. 702(a).  The Court will exclude this testimony.

### e.  Inherent Risk

In rebuttal, Shealy states: "It is my opinion that collisions of this sort are not an inherent

19

risk of skiing"; rather, this collision was "the result of bad decisions on the part of" Menjoulet. 3/1/22 Shealy Rep. at 3.  As discussed, whether the skiers in this case assumed a risk inherent to the sport is irrelevant to Menjoulet's liability under the SASA.  See Rusnak, 729 N.W.2d at 546. Shealy may not testify on this topic.

In sum, the Court grants in part and denies in part both motions to exclude expert evidence. Both Petrozzi and Shealy may testify as to expectations set by the Skier's Responsibility Code. Shealy may also testify to the likely speeds, distances, and reaction times of the individuals involved in the collision and the meaning of a green circle trail.  The experts' other proffered opinions discussed above will be excluded.

## C. Menjoulet's Motion to Preclude Admission of Various Types of Evidence and Jordan's Motion to Exclude Character Evidence

Menjoulet moves in limine to preclude the admission of various types of evidence offered by Jordan.  As discussed, the Court denies Menjoulet's motion to the extent he seeks to preclude expert testimony on the Skier Responsibility Code.  The Court turns next to the remaining issues in Menjoulet's motion to preclude, as well as an overlapping issue presented in Jordan's motion to exclude character evidence.

### i. Admissibility of Menjoulet's Statements to Insurer

Jordan submits that, during his deposition, Menjoulet agreed with opposing counsel that Jordan had "cut [him] off."  Menjoulet Dep. at 20–21.  In tension with this testimony, Jordan submits a recording of a conversation Menjoulet had with his liability insurance representative from Auto-Owners Insurance in which—when asked how the collision occurred—Menjoulet stated, "She came, she kind of, I'm not going to say cut me off."  Pl. Br. in Supp. Resp. Mot.

Summ. J. at 4 (citing Insurer Recording (Ex. 2)) (emphasis added).[13]  Also, in the context of his

insurer's questions regarding whether Jordan "did something wrong to contribute towards this,"

Menjoulet stated, "Yeah, no, she didn't do anything."  Id. at 5 (citing Insurer Recording).

Menjoulet originally conceded that Menjoulet's statements may be admissible as

statements of an opposing party, but he argued that the content of the recording is inaccurate,

untrustworthy, and prejudicial.  Def. Resp. to Mot. to File at 6–10 (Dkt. 54).  In his present motion

to preclude Jordan from admitting evidence, Menjoulet similarly submits that the Court may

exclude Menjoulet's statements on the recording if their probative value is substantially

outweighed by a danger of unfair prejudice.  See Def. Mot. to Exclude at 21 (citing Fed. R. Evid.

403).  Menjoulet also argues that the recording is "evidence that a person was or was not insured

against liability," which is "is not admissible to prove whether the person acted negligently or

otherwise wrongfully."  Id. (citing Fed. R. Evid. 411).  Lastly, Menjoulet argues that the insurer's

recorded conversation with him was prepared in anticipation of litigation.  Id. (citing Fed. R. Evid.

26(b)(3)(A)).

None of these arguments requires the exclusion of Menjoulet's recorded statements from

evidence.  As to the alleged risk of unfair prejudice, Menjoulet argues only that the jury might take

"improper consideration of the mere existence of defendant's liability insurance and

representative's involvement as opposed [to] the facts applied to the duties enumerated under the

SASA."  Def. Resp. to Mot. to File at 7; see also Def. Mot. to Exclude at 21.  The Court rejects

Menjoulet's speculative and unsupported submission that any mention of insurance would be

_____

[13] This filing was made in the traditional manner and so is not available on the docket.  The Court
allowed Jordan to file this exhibit in the traditional manner and stated that it would address its
admissibility when it ruled on Menjoulet's motion for summary judgment.  6/30/22 Order at 1–2
(Dkt. 57).

prejudicial.  In fact, the rule's express allowance for a jury to learn about the existence of insurance for proper purposes undermines Menjoulet's argument.  The rule reflects the belief that juries can be expected to follow a court's instruction to consider evidence about insurance for proper purposes only.

Further, Jordan does not present this recording as evidence that Menjoulet was negligent by virtue of being insured; she presents this evidence to show Menjoulet's potentially inconsistent statements and to develop the factual account of an important witness.  Because Jordan is not using Menjoulet's insured status as evidence of negligence, the prohibition contained in Rule 411 is inapplicable.

Menjoulet also argues that the recording is protected by the work-product doctrine, which disallows admission of "documents 'prepared in anticipation of litigation . . . by or for another party or its representative.'"  S. Fifth Towers, LLC v. Aspen Ins. UK, Ltd., 763 F. App'x 401, 405 (6th Cir. 2019) (quoting Fed. R. Civ. P. 26(b)(3)(A)) (affirming application of work-product doctrine to documents prepared by counsel for insurance company party to suit).  Jordan responds that any work-product protection was waived because Menjoulet "freely produced the statement during the course of discovery and did not seek a protective order regarding the same."  Pl. Resp. to Mot. to Preclude at 12–13.  Jordan also notes that she has relied on the recorded statement throughout discovery, and Menjoulet has made no objection to its use.  Id. at 12.  Menjoulet does not deny that he produced the recording at issue, and he makes no response to the argument that he waived any work-product protection.  See Def. Reply. in Supp. Mot. to Preclude.

"[V]oluntary production" of materials otherwise protected by the work product doctrine "serve[s] as a waiver of the Rule 26 protections."  Serrano v. Cintas Corp., No. CIV.A 04-40132, 2010 WL 746430, at *8 (E.D. Mich. Mar. 2, 2010) (granting motion to compel production of

documents where party waived any work-product protections via voluntary production); <u>see also</u> <u>In re Columbia/HCA Healthcare Corp. Billing Pracs. Litig.</u>, 293 F.3d 289, 307 (6th Cir. 2002) (affirming finding that party had waived work-product protections of documents by producing those documents to non-party government entities); Fed. R. Evid. 502(b) (explaining that disclosure of a communication covered by work-product protection does not operate as a waiver if the disclosure is inadvertent and the holder took reasonable steps to prevent disclosure).

Given Jordan's uncontroverted assertion that Menjoulet produced the recording and declined to object to its use during depositions, the Court understands that Menjoulet's production of the recording was voluntary. Menjoulet has provided no argument that the disclosure was inadvertent or that he took reasonable steps to prevent it. <u>See</u> Fed. R. Evid. 502(b). Thus, Menjoulet has waived any work-product protections that might otherwise apply. <u>See</u> <u>Serrano</u>, 2010 WL 746430, at *8; <u>In re Columbia</u>, 293 F.3d at 307.

Menjoulet has failed to show that there is any merit to the bases on which he attempts to exclude his statements in the recorded conversation with his insurer. The Court denies Menjoulet's motion as to these statements.

**ii. Witnesses Allegedly Presenting "Character Evidence"**

Both Jordan and Menjoulet challenge the testimony of certain witnesses as violative of Federal Rule of Evidence 404(a)(1), which precludes admission of "[e]vidence of a person's character or character trait . . . to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1); <u>see also</u> Advisory Committee Notes on Fed. R. Evid. 404(a)(1) ("[I]n a civil case evidence of a person's character is never admissible to prove that the person acted in conformity with the character trait."). However, notwithstanding Rule 404(a)(1), "[w]hen a person's character or character trait is an essential element of a charge, claim,

or defense, the character or trait may also be proved by relevant specific instances of the person's conduct."  Fed. R. Evid. 405(b).

Jordan seeks to preclude Menjoulet from introducing the testimony of witnesses in his personal life—fiancée Margaret Arnold and fiancée's son Matthew Campbell—"to show Defendant skis and snowboards safely."  Pl. Mot. to Exclude Character Evid. at 1 (citing Fed. R. Evid. 404(a)(1)); Advisory Committee Notes on Fed. R. Evid. 404(a)(1).  Jordan requests that the Court prevent Menjoulet from "eliciting any testimony that would constitute character evidence of Defendant's traits while skiing and snowboarding" in violation of Rule 404(a)(1).  Pl. Mot. to Exclude Character Evid. at 7.

As Menjoulet correctly argues, see Def. Resp. to Mot. to Exclude Character Evid. at 2, the Federal Rules of Evidence do not bar all testimony on Menjoulet's skiing experience.  Under the SASA, one of a skier's duties under the SASA is to "conduct himself or herself within the limits of his or her individual ability."  Mich. Comp. L. § 408.341(1).  Thus, the limits of Menjoulet's individual skiing ability are "an essential element of a charge" at issue in this case.  Fed. R. Evid. 405(b).  To the extent that Menjoulet's skiing ability can be characterized as a "character trait" within the scope of Rules 404 and 405, Menjoulet may present evidence on "the limits of his . . . individual [skiing] ability."[14]

However, Jordan is correct that whether Menjoulet skied safely in the past is not an essential element to the charge that he violated his SASA duties on the occasion at issue.

_____

[14] The Court notes that Menjoulet's skiing ability could also be characterized as a skill rather than a character trait, and relevant evidence on a skill is also admissible, as distinct from character evidence barred by Rule 404(a).  See Soliman v. Maersk Line Ltd, 235 F. Supp. 3d 410, 413 n.1 (E.D.N.Y. 2017) (explaining that testimony about defendant's competence as seaman in maritime negligence suit was not character evidence prohibited under Rule 401, but rather admissible evidence "to demonstrate that [defendant] possessed the requisite skill and knowledge to appreciate the risks associated with this particular task").

Menjoulet may not present evidence that Menjoulet has skied safely in other situations as "evidence . . . to prove that on [this] particular occasion" Menjoulet "acted in accordance" with that tendency to ski safely.  Fed. R. Evid. 404(a)(1).  See In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prod. Liab. Litig., 512 F. Supp. 3d 803, 811 (S.D. Ohio 2021) (noting that evidence that defendant had "always" manufactured its devices "safely" was "inadmissible propensity evidence").

Menjoulet raises a similar objection to the testimony of Higgs, who was present on the slope uphill from Menjoulet at the time of the collision.  See Higgs Dep. at 18–19.  Higgs testified not only that he was present during the collision but that he observed both Jordan and Menjoulet skiing earlier the same day.  See id. at 15–17.  This testimony included Higgs's understanding— contradicted by Jordan's—that Higgs had observed Jordan skiing on harder courses like "blues" and "black diamonds."  Id. at 15–16.  Higgs stated that he had watched Menjoulet snowboarding before the collision occurred, and he thought that Menjoulet was "struggling" on one of the green runs.  Id. at 16–17.  Higgs also opined that Menjoulet "wasn't very good at turning" and that he looked "shaky, unstable, . . . like a deer learning to walk."  Id.  In a written "Witness Statement" submitted to Caberfae on the day of the accident, Higgs also stated: "It looked like [Menjoulet] was going too fast for his ability. . . . [He] was skiing fast and a little out of control."  Higgs Stat.

Menjoulet argues that Higgs's descriptions of Menjoulet skiing earlier in the day are inadmissible character evidence offered to show propensity under Federal Rule of Evidence 404(a)(1).  Def. Reply in Supp. Mot. to Preclude at 3–4.  He also argues that "Higgs possess[es] no knowledge as to defendant's ski level or experience and lacks any foundation as to whether defendant snowboarded too fast for his ability."  Def. Reply in Supp. Mot. Summ. J. at 4–5.

As to the character evidence objection, Higgs's account of how Menjoulet was skiing on the day of the accident is admissible for the same reason that the testimony of Menjoulet's family members is admissible: it is used to prove the limits of Menjoulet's individual skiing ability, which is an essential element of the charge that Menjoulet violated the SASA. See Fed. R. Evid. 405(b); Mich. Comp. L. § 408.341(1).

Further, as a lay witness, Higgs may offer relevant testimony where he has "personal knowledge of the matter." Fed. R. Evid. 602. Despite Menjoulet's argument that Higgs has no personal knowledge of Menjoulet's aptitude for skiing, Higgs's perceptions of the manner in which Menjoulet was skiing on the day of the collision are relevant to the question of whether Menjoulet was skiing outside the limits of his individual ability. The Court will allow this testimony.

The Court grants Jordan's motion, in that Menjoulet may not present witness testimony in violation of Rule 404(a) on any propensity of Menjoulet's to ski safely. However, Menjoulet may present witnesses who can speak to Menjoulet's individual skiing ability. Higgs may testify on how Menjoulet and Jordan were skiing on the day of the accident and other events relevant to the collision, to the extent that his testimony is based on his own perception and personal knowledge.

### iii. Testimony of Caberfae Employees

Jordan refers the Court to the testimony of three Caberfae employees who did not witness the collision but had some level of involvement after it occurred. See Pl. Br. in Supp. Resp. Summ. J. at 7–11 (citing Devereaux Dep. at 27–28 (reflecting testimony of patrolman Devereaux, who responded to accident, that "the downhill skier always has the right of way" and that Menjoulet's description of the collision did not sound like he was staying in control); Meyer Dep. at 23–24 (reflecting testimony of Caberfae operations manager Meyer that "the downhill skier has the right of way[,] so if you're uphill, you got to be able to stop and avoid them—avoid the person no matter

what they do" and that a reason for the collision could have been that Menjoulet "was going too fast to react"); Biermacher Dep. at 25–26 (Ex. 10) (reflecting testimony of patrolman Joseph Biermacher, who responded to the accident, that "[t]he downhill skier always has the right of way[;] the uphill skier must stay in control to avoid the downhill skier")).

Menjoulet argues that Biermacher, Meyer, and Devereaux are not experts and did not witness Menjoulet's manner of snowboarding, and so they have no relevant testimony pertinent to the case. Def. Reply in Supp. Mot. Summ. J. at 3–4. Menjoulet notes that none of these three witnesses were identified or properly disclosed as experts. Def. Mot. to Preclude at 16. He submits that these witnesses have "expressed opinions that are neither based on their own perceptions nor helpful to assist a jury in determining a fact in issue." Id. at 17; see also Def. Reply in Supp. Mot. to Preclude at 4–5.

Jordan argues that these three individuals "listened to the recorded statement of the Defendant" made to Menjoulet's insurer, that all three men are "professionals who do this for a living," and that at least some of them "responded to the accident." Pl. Br. in Supp. Resp. to Mot. to Exclude at 3–4. Jordan submits that these individuals "are more than qualified to offer opinions based upon Defendant's own admissions in his recorded statement," noting that each of them "testified Defendant violated the NSAA and the SASA when they heard his recorded statement." Id. at 10–11.

These individuals are not experts. Their testimony is limited to matters within their own perception and personal knowledge. Fed. R. Evid. 602 (allowing witness to testify on a matter "only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter"); Fed. R. Evid. 701(a) (limiting non-expert opinion testimony to that "rationally based on the witness's perception"). Devereaux, Biermacher, and Meyer have not been

27

presented as experts on the Skier Responsibility Code, and they may not testify on a skier's expectations under this standard, including in regard to whether anyone had any particular duty. They are also precluded from opining on whether Menjoulet violated the SASA. If these individuals have personal knowledge relating to facts relevant to this case, then they may testify as to those facts. See Fed. R. Evid. 602. If they have opinions rationally based on their perceptions that otherwise comply with Federal Rule of Evidence 701, then they may express those opinions. See Fed. R. Evid. 701.

### iv. Exclusion of Jordan's Witnesses Michael Jordan, Ondrej Jordan, Kathryn Jordan and Dean Dahlgren

Jordan seeks to admit the testimony of certain of her family members: Michael Jordan, Ondrej Jordan, Kathryn Jordan, and Dean Dahlgren. See Pl. Resp. to Mot. to Preclude at 11. Menjoulet argues that Jordan listed these individuals as part of her initial disclosures, but that she did not identify their addresses, their phone numbers, or the subjects of discoverable information on which they would testify, as required by Federal Rule of Civil Procedure 26(a). Def. Mot. to Preclude at 18 (citing Pl. Initial and Expert Disclosures (Dkt. 63-2)). Jordan responded to interrogatories by stating that she did "'not yet know what each witness will testify to.'" Id. (quoting Pl. Resp. to Interrogatories). There is no indication in the record that Jordan subsequently supplemented her initial disclosures pursuant to Rule 26(e). Menjoulet argues that Jordan's disclosures violate both Rule 26 and this Court's scheduling order, and that Jordan's failure to provide the required information before the end of discovery should preclude her reliance on these witnesses at trial. Id. at 19–20 (citing Fed. R. Civ. P. 37(a)).

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ.

P. 37.  Jordan concedes that she failed to disclose these individuals' contact information and the subject of their testimony, but she attempts to push responsibility onto Menjoulet for not adequately preparing for these witnesses, stating that Menjoulet never "made an attempt to depose these witnesses, file a motion to compel, or even ask Plaintiff during her deposition what these witnesses may testify to."  Pl. Br. in Supp. Resp. to Mot. to Exclude at 5–6.  Jordan considers the attempt to exclude this testimony to be "technical gamesmanship."  Id. at 11.  She argues that non-disclosure of witnesses is "harmless where the other party knows the names of its witnesses and the scope of their relevant knowledge well before trial."  Id. at 11–12 (punctuation modified). Jordan states that she "provided her family background to defense counsel at her deposition."  Id. at 11.

Jordan's assertions are insufficient to demonstrate that her failure to comply with Rule 26 was harmless.  The basis of her argument is that Menjoulet knew the subject matter of these witnesses' testimony without her having to disclose it, apparently because Jordan discussed her "family background" at her deposition.  The Court is not satisfied that a reference to Jordan's family background mid-discovery allows her to flout the specific requirements of Rule 26.  Nor is the Court satisfied that the subject matter of these witnesses' testimony has been explained to Menjoulet at any point, see Def. Reply in Supp. Mot. to Preclude at 5–6; it is not clear to the Court why these witnesses, who were not present at Caberfae on the day of the incident, are relevant to Jordan's case.  Jordan is precluded from calling these witnesses as a sanction under Rule 37 for her failure to properly disclose them under Rule 26(a) or to include them in supplemental disclosures under Rule 26(e).

In sum, the Court grants in part and denies in part Menjoulet's motion to preclude admission of evidence, and it grants Jordan's motion to exclude character evidence violative of

Federal Rule of Evidence 404(a).  Menjoulet's recorded statements to his insurer are admissible.
The testimony of all lay witnesses is limited to matters within their own perception and personal
knowledge.  Higgs and Menjoulet's family members may offer testimony relevant to whether
Menjoulet was skiing outside the limits of his individual ability, but Menjoulet may not present
testimony on his propensity to ski safely.  Jordan is barred from presenting witnesses whom she
did not properly disclose under Rule 26—i.e., Michael Jordan, Ondrej Jordan, Kathryn Jordan and
Dean Dahlgren.

**D. Jordan's Motion to Exclude Expert Reports and Deposition Transcripts as Hearsay**

Jordan seeks to preclude Menjoulet from introducing expert reports and deposition
transcripts as exhibits at trial.  Pl. Mot. to Exclude Ex. at 1 (Dkt. 65).  Jordan asserts that these
documents are inadmissible hearsay under Federal Rules of Evidence 801 and 802.  Id. at 2.

Regarding expert reports, "[c]ourts in the Sixth Circuit have concluded that expert reports
constitute hearsay under the Federal Rules of Evidence and are therefore admissible only if an
exception applies."  Hughey v. Easlick, No. 19-10368, 2022 WL 15523071, at *3 (E.D. Mich. Oct.
26, 2022) (finding expert report inadmissible hearsay).  Menjoulet submits that expert reports may
be admissible to rehabilitate a witness.  See Def. Resp. to Pl. Mot. to Exclude Ex. at 8 (citing
United States v. Harris, 761 F.2d 394, 399–400 (7th Cir.1985)).  Menjoulet is correct that a court
may admit "prior out-of-court statements for rehabilitative purposes."  Engebretsen v. Fairchild
Aircraft Corp., 21 F.3d 721, 730 (6th Cir. 1994) (citing Harris, 761 F.2d at 399–400).  Menjoulet's
expert reports are presumptively inadmissible as hearsay; however, if an exception or exclusion to
the hearsay rule like rehabilitation of a witness applies, Menjoulet may admit an expert report for
that purpose.

Deposition transcripts are also presumptively inadmissible hearsay if they constitute out-of-court statements offered to prove the truth of the matter asserted, <u>see, e.g.</u>, <u>Barnett v. Bynum</u>, No. 13-CV-14063, 2015 WL 7008574, at *2 (E.D. Mich. Nov. 12, 2015)—unless an exception or exclusion to hearsay applies.  Menjoulet submits that deposition transcripts may be admissible as party admissions or impeachment evidence.  <u>See</u> Def. Resp. to Pl. Mot. to Exclude Ex. at 7. Menjoulet is correct that deposition transcripts may fit an exclusion or exception to the rule against out-of-court statements offered for the truth of the matter asserted.  <u>See</u> Fed. R. Evid. 801(d). Additionally, Federal Rule of Civil Procedure 32 governs the use of depositions during court proceedings and allows for admission of a deposition transcript if, for example, a witness is unavailable.  <u>See</u> Fed. R. Civ. P. 32(a)(4).

Because admission of the expert reports and deposition transcripts will depend on future circumstances, the Court will deny Jordan's motion without prejudice, subject to renewing it prior to the final pretrial conference.

**F. Jordan's Motion for De Bene Esse Depositions or Remote Appearance at Trial**

Jordan filed a motion raising concerns with the testimony of her three treating physicians (Charles Lieder, Andrew Boyce, and Narcisa Surucci) and a retained expert (Richard Bays).  <u>See</u> Pl. Mot. for Dep. at 2.  Jordan requests to either (i) take the de bene esse depositions of these witnesses in the two weeks before trial or (ii) have these witnesses appear at trial live remotely via Zoom pursuant to Fed. R. Civ. P. 43.  Menjoulet objects to Jordan's motion, observing that the deadline for any de bene esse depositions has passed.  <u>See</u> Def. Resp. to Pl. Mot. for Dep. at 1–3.

Jordan missed her deadline to complete de bene esse depositions, <u>see</u> 5/28/21 Order (Dkt. 22), but there is no apparent prejudice to Menjoulet.  The Court will take the motion under

advisement and address it at the status conference that will be convened to set future dates in the case.

## IV.  CONCLUSION

For the reasons explained above, the Court denies Menjoulet's motion for summary judgment (Dkt. 51), grants in part and denies in part Menjoulet's motion to exclude Jordan's expert (Dkt. 49), grants in part and denies in part Jordan's motion to exclude Menjoulet's expert (Dkt. 50), grants in part and denies in part Menjoulet's motion in limine to preclude admission of various categories of evidence presented by Jordan (Dkt. 63), grants Jordan's motion to exclude character evidence (Dkt. 64), denies without prejudice Jordan's motion to exclude exhibits as hearsay (Dkt. 65), and takes under advisement Jordan's motion to take de bene esse depositions or to have witnesses appear remotely (Dkt. 68).

SO ORDERED.

Dated:  March 31, 2023                                    s/Mark A. Goldsmith
      Detroit, Michigan                                    MARK A. GOLDSMITH
                                        United States District Judge